Filed 2/3/23  In re M.S. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| In re M.S. et al., Persons Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> A.S., <br><br> Defendant and Appellant. | D080976 <br><br> (Super. Ct. No. NJ15864AB) |

APPEAL from orders of the Superior Court of San Diego County, Michael Imhoff, Judge. Affirmed.

Richard L. Knight, under appointment by the Court of Appeal, for Defendant and Appellant.

Claudia S. Silva, County Counsel, Caitlan E. Rae, Chief Deputy County Counsel, and Lisa M. Maldonado, Deputy County Counsel, for Plaintiff and Respondent.

A.S. (Mother) appeals from orders of the juvenile court finding jurisdiction over her two daughters, M.S. and K.S. (collectively, the children), and placing them with their father, S.S. (Father). Mother contends the juvenile court erred by failing to find the placement would be detrimental to the children, under Welfare and Institutions Code section 361.2, subdivision (a).[1] We find no error and affirm the juvenile court's orders.

## I. FACTUAL AND PROCEDURAL BACKGROUND

Mother and Father have been legally married since 2009, before the children were born, but have been separated for approximately six years. Both parents have a history of substance abuse.

In July 2022, the children, then 8 and 11 years old, were living with Mother. They did not have a home and stayed with friends, in motels, and in their van. In the early morning hours of July 22, law enforcement responded to a call for trespassing, and found Mother asleep in the driver seat of the van. A male, identified as "maternal [u]ncle Jeremy," was asleep in the passenger seat, and the children were asleep in the back. The police asked Mother for identification, and she asked the children to look for it inside her purse. There was a white residue in the purse, which the children were exposed to when they opened the purse. A search revealed multiple small baggies of Fentanyl, a small bag of methamphetamine, and some pain pills. At least some of the drugs were found in Mother's purse. The police arrested Mother, and took the children into protective custody.

Father was living in Arkansas at the time. He had not seen the children in about two years but did speak with them on a regular basis. He

---

[1] All further statutory references are to the Welfare and Institutions Code.

said the family had previously lived together in Arizona, but Mother kept running away from him with the children. They were separated but had not been to court and did not have a formal custody arrangement. He suspected Mother was using drugs, and had asked her to get sober, but he did not think he would be able to get custody of the children without proof. He said he was employed, was living with the paternal grandmother, and was able and willing to care for the children. Father admitted he had been arrested for public intoxication about two months earlier, but denied any current drug or alcohol use and said he was willing to drug test.

The paternal grandmother reported that Mother had recently agreed to come live with her and Father, but then stopped returning her calls. She said M.S. contacted her a week or two ago, upset about where they were staying, and Father had tried to get ahold of Mother to pick up the children, but Mother did not respond until the next day. The paternal grandmother confirmed that Father lived with her, and said she had no concerns regarding Father's use of drugs or alcohol. Father had been doing well for the past year, and she was "more than willing to help care for the [children]." When asked if she would be okay with the children going to live with Father, Mother initially said yes, and that it would be the "best thing" for them.

The San Diego Health and Human Services Agency (the Agency) filed juvenile dependency petitions on behalf of the children on August 1, 2022. The Agency alleged the children were at substantial risk of harm due to Mother's drug use, and Father's inability to protect them. In the associated Detention Report, the Agency expressed concern that Father "acknowledged he had concerns about [M]other's drug use but did not take protective actions by securing custody of his children to ensure their safety." Accordingly, the Agency recommended the children be detained outside the home.

In a follow-up interview a couple of weeks later, Father told the Agency he had wanted to take the children from Mother but was unable to locate them. He said Mother did not tell him where they were living and had also instructed the children not to tell him. "He stated that he did not even know where to start looking for them," and "if he had known where they were, he would have dropped everything to go and get them." Father said he had taken care of the children for one and a half years while mother was in prison, when the children were approximately three and five years old, but he let them go back to Mother after she got out of jail, and she started running from state to state and kept the children from him.

Father admitted using marijuana, methamphetamines, and heroin in the past. He said he started using "hard drugs" after the children went back to Mother in 2016 and used "on and off" until late 2020. He said that he had gone to treatment in Washington about four years ago and had not used hard drugs for about two years or marijuana for about a year. He admitted relapsing on alcohol three months prior. He said he had been sober for an extended period of time and thought he could have a "few beers to relax," but it escalated to drinking to get drunk. He admitted alcohol was his "main trigger" and a gateway to other drugs but said that he planned to never drink alcohol again. He previously attended AA meetings but now got support from his church, and was studying to become a Jehovah Witness.

An Agency social worker did a virtual walk-through tour of Father's home and confirmed that it was clean, safe, and appropriate for the children. Father reiterated that he would like to have the children come live with him. He said he had a job and the support of the paternal grandmother, and was willing to work with the child welfare services agency in his county if an

ICPC[2] were approved.  The paternal grandmother also reiterated that she would like to have the children come live with her and Father, and agreed that she would support Father and would call child welfare services if she had any concerns.

Father came to San Diego to visit the children in San Diego in late August 2022.  The social worker took the children to the airport to pick Father up.  M.S. lowered the window, eagerly looking for Father on the curb.  Both children got out of the car when they saw Father and ran to him to give him a hug.  Father and the children talked throughout the car ride to the hotel.

After the visit, M.S. stated she was "okay going to Arkansas with [F]ather at first, but now wants to stay in San Diego."  She said Mother would be all alone in San Diego, and she wanted to stay to be able to see her in person, to see if she was really trying, and because she wanted to live with Mother again.  She also said that she did not like that Father did not celebrate holidays due to his religion.  Likewise, K.S. said that she did not want to live with Father because she wanted to stay near Mother.  She also believed Father would move to San Diego if they did not go to Arkansas.

The juvenile court held a contested jurisdiction and disposition hearing in early September 2022. Both children testified.  Consistent with their previous statements, each said they did not want to move out of state because they wanted to stay close to Mother.  They also said they had concerns about Father drinking or getting mad.

---

2       Interstate compacts, like the Interstate Compact on the Placement of Children (ICPC), are formal agreements to facilitate cooperation between participating states in the placement and monitoring of dependent children. (See *In re C.B.* (2010) 188 Cal.App.4th 1024, 1031−1032).

The juvenile court made true findings on the petition and took jurisdiction over the children. The court found clear and convincing evidence that there would be substantial risk of harm to the children if returned to Mother's care, but stated it could not find clear and convincing evidence that it would be detrimental to place the children with Father. The court then placed the children with Father subject to the following conditions: 1) Father was to ensure the children enrolled in and attended therapy; 2) Father was to maintain a minimum of three video visits with Mother each week; and 3) Father was to allow the social worker, minor's counsel, or their designee, entry to the home and to meet with the children, privately if necessary, during reasonable hours. The court set an interim family maintenance review hearing for December 8, 2022.

## II. DISCUSSION

Mother contends the juvenile court abused its discretion by failing to make a finding, pursuant to section 361.2, subdivision (a), that placement with Father would be detrimental to the children. The Agency asserts Mother assumed the burden of proving detriment by clear and convincing evidence and, having failed to meet that burden in the juvenile court, Mother must now establish error as a matter of law on appeal. The Agency contends further that Mother has failed to meet her burden regardless of the applicable standard. We agree.

After a juvenile court exercises jurisdiction over a child pursuant to section 300, it must determine the appropriate disposition for that child. (§§ 360, subd. (d), 361, 362; *In re N.M.* (2011) 197 Cal.App.4th 159, 169.) Where, as here, the court removes the child from the care of the custodial parent pursuant to section 361, section 361.2 requires the court to determine "whether there is a parent of the child, with whom the child was not residing

6

at the time that the events or conditions arose that brought the child within the provisions of [s]ection 300, who desires to assume custody of the child. If that parent requests custody, the court shall place the child with the parent unless it finds that placement with that parent would be detrimental to the safety, protection, or physical or emotional well-being of the child[ren]." (§ 361.2, subd. (a); *In re Zacharia D.* (1993) 6 Cal.4th 435, 453.) "To comport with due process, the detriment finding must be made under the clear and convincing evidence standard." (*In re C.M.* (2014) 232 Cal.App.4th 1394, 1401.) The juvenile court must weigh all relevant factors to determine if the child will suffer net harm. (*In re A.C.* (2020) 54 Cal.App.5th 38, 43.)

We typically review the juvenile court's factual findings for substantial evidence. (*In re V.L.* (2020) 54 Cal.App.5th 147, 155.) "[W]hen reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. Consistent with well-established principles governing review for sufficiency of the evidence, in making this assessment the appellate court must view the record in the light most favorable to the prevailing party below and give due deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 995–996.)

"But this test is typically implicated when a defendant contends that the plaintiff succeeded at trial in spite of insufficient evidence." (*In re I.W.* (2009) 180 Cal.App.4th 1517, 1528.) In *In re I.W.*, the court explained, when "the trier of fact has expressly or implicitly concluded that the party with the burden of proof did not carry the burden and that party appeals, it is

misleading to characterize the failure-of-proof issue as whether substantial evidence supports the judgment." (*Ibid*.) Instead, "the question for a reviewing court becomes whether the evidence compels a finding in favor of the appellant as a matter of law" or, put another way, "whether the appellant's evidence was (1) 'uncontradicted and unimpeached' and (2) 'of such a character and weight as to leave no room for a judicial determination that it was insufficient to support a finding.' " (*Ibid*.)

Relying on *In re I.W.*, the Agency asserts Mother assumed the burden to prove, by clear and convincing evidence, that placement with Father would be detrimental to the children and, thus, on appeal, Mother must prove the juvenile court erred as a matter of law. But, as other courts have explained, "this is but another formulation of the substantial evidence standard." (*In re Sheila B.* (1993) 19 Cal.App.4th 187, 199.) Regardless of how it is phrased, our review of the juvenile court's decision to place the children with Father under section 361.2, subdivision (a) is deferential. (*In re A.C., supra,* 54 Cal.App.5th at p. 43; see also *In re Patrick S.* (2013) 218 Cal.App.4th 1254, 1263 ["When the parent is competent, the standard of detriment is very high."].)

Mother has not established error under this deferential standard. Father has cared for the children in the past without incident. While he admittedly struggled with substance abuse in the interim, he is currently in a stable living situation with the paternal grandmother, who indicated he is doing well and agreed to be an additional support for him and the children. The juvenile court acknowledged the children would be impacted by the move, and that they had testified honestly about their concerns. But, the court noted Father's visit with them in San Diego went well; both children were excited to see him and comfortable in his care. After carefully

considering all the evidence, the court concluded it would not be detrimental to place the children with Father, under continued supervision. And, as an added measure, the court put conditions in place to ensure the children, who are both old enough to report any concerns, had regular contact with the Agency and Minor's counsel.

Mother asserts several reasons the court should have instead made a detriment finding, but none are convincing. Mother's primary assertion is that neither the court nor the Agency adequately considered Father's history of substance abuse and recent relapse on alcohol. She argues Father admitted that alcohol was a "trigger" or "gateway" for him, and, despite this, the Agency did not require drug testing or proof of treatment. But, as the social worker explained at the hearing, Father was open and honest about his history, including the relapse. He readily admitted alcohol was a trigger, acknowledged that he could not have just a few beers, and told the social worker he intended to abstain from alcohol completely. Father's recognition of alcohol as a trigger, and commitment to avoiding it in the future, suggest that he has gained insight in his recovery. Further, as the social worker pointed out, Father was not caring for the children when the relapse occurred.

While it would have been preferable for the Agency to take further steps to verify Father's sobriety, the Agency's failure does not establish detriment. Rather, there was credible evidence before the court suggesting Father was, in fact, sober. Father was forthcoming with the Agency about his past, including his most recent relapse. He showed no signs of impairment during his visit to San Diego, and the children reported that he did not drink alcohol. And, of critical importance, the children would not be living with Father alone. The paternal grandmother also lived in the home,

9

was committed to supporting Father and the children, and agreed to call the social worker if she had any concerns.

Mother asserts both the children had concerns regarding Father's drinking, but there was at least some indication that those concerns were, at least in part, the result of Mother's influence. The caregiver said she had to intervene and end a phone call between Mother and the children because Mother was telling them that Father gets drunk and is violent. M.S. testified that Father had gotten into "some fights" while drinking in the past, but then stated that she had never seen him get into a fight herself and that it was something that another person told her. She later recalled a single incident in which they were walking to the store and Father got into a fight after stopping at a friend's house, but she could not recall when that occurred, and did not suggest Father was under the influence at the time. K.S. testified she had seen Father yell, but did not recall seeing him drink. The juvenile court was in the best position to weigh the evidence, including the testimony of the children and the social worker. (See *Conservatorship of O.B., supra,* 9 Cal.5th at pp. 995−996.)

Next, Mother complains the social worker had never gone to Father's house in Arkansas, but, as she concedes, the social worker did do a video tour of the home. Mother argues the social worker could not know if she was seeing everything in the house on video, but she presents no evidence establishing the video tour was incomplete, or that there was some unknown danger in the home. At trial, the social worker confirmed Father gave her "a tour of the *entire* home," and Mother had the opportunity to cross-examine her regarding any alleged deficiencies. (Italics added.)

Finally, Mother asserts Father has a lengthy criminal history. But Father's record was before the court and, as the Agency points out, many of

the charges were dismissed. Both Mother and Father were convicted of possessing marijuana for sale in 2009, and sentenced to three years of probation. Father's remaining convictions were relatively minor, and Mother presents no argument or authority explaining how Father's past charges place the children at current risk of harm. Mother relies generally on *In re V.F.* (2007) 157 Cal.App.4th 962, in which the appellate court stated, in passing, that the record *arguably* would support a detriment finding, but, even there, the appellate court deferred to the juvenile court. (*Id*. at p. 973.) Moreover, there, unlike here, the father was currently serving a 13-year prison sentence. (*Id*. at p. 966.)

In sum, we conclude the juvenile court did not err in concluding it would not be detrimental to place the children with Father, under continued supervision. (See *In re C.M., supra,* 232 Cal.App.4th at p. 1402 [finding minor's desire to remain with maternal grandparents, father's long work hours, and father's history of alcohol abuse and domestic violence insufficient to support a finding of detriment].)

## III. DISPOSITION

The orders of the juvenile court are affirmed.

HUFFMAN, Acting P. J.

WE CONCUR:

IRION, J.

DATO, J.